412 So.2d 649 (1982)
Donald Mouton QUINN, III, Plaintiff-Appellee,
v.
Judith Lynn Fletcher QUINN, Defendant-Appellant.
No. 14780.
Court of Appeal of Louisiana, Second Circuit.
March 2, 1982.
Rehearing Denied April 12, 1982.[*]
Writs Denied June 4, 1982.
*650 Sockrider & Bolin by H. F. Sockrider, Jr., Shreveport, for defendant-appellant.
McLeod, Verlander & Dollar by Robert P. McLeod and David E. Verlander, III, Monroe, for plaintiff-appellee.
Before PRICE, HALL and FRED W. JONES, Jr., JJ.
En Banc. Rehearing Denied April 12, 1982.[*]
HALL, Judge.
Plaintiff, Dr. Donald M. Quinn, III, filed suit in September 1980 against defendant, Judith Lynn Fletcher Quinn, seeking a separation on the grounds of cruel treatment and custody of their five-year-old son, Zachary. Temporary custody was awarded to Dr. Quinn by ex parte order. The defendant reconvened seeking a separation on the grounds of constructive abandonment and also seeking custody of the child. After a 17-day trial which took place over a period of several months and pursuant to written reasons for judgment, judgment was rendered granting a separation on the basis of mutual fault, awarding custody of the child to plaintiff and awarding defendant alimony pendente lite of $1,000 per month beginning April 1, 1981.
Defendant appealed contending that the trial court erred in failing to award her a separation on the grounds of abandonment, in failing to award custody of the child to her, in failing to award an adequate amount of alimony pendente lite and in failing to make the alimony award retroactive to the date the reconventional demand was filed. Plaintiff answered the appeal contending that the trial court erred in failing to award him a separation on the grounds of cruel treatment.
For reasons expressed in this opinion we affirm the judgment awarding custody to the plaintiff father. We set aside that part of the judgment awarding a separation on the grounds of mutual fault and render judgment awarding defendant a separation on the grounds of abandonment. We affirm the amount of the alimony pendente lite award, but modify the judgment to make the award effective from the date of filing the reconventional demand.
Background Facts
After going together for several years during college and while plaintiff served a tour of duty in the service, plaintiff and defendant were married in the summer of 1971. Plaintiff had grown up in Bastrop in north Louisiana where his father was an established dentist and defendant had grown up in Franklin in south Louisiana. Both attended and graduated from Northeast in Monroe, plaintiff majoring in psychology and defendant obtaining a degree in education. The couple moved to Baton Rouge in the fall of 1971 so that plaintiff could attend law school at LSU. Plaintiff attended law school for one semester and then obtained employment in Baton Rouge. Defendant taught school in the Baton Rouge area until the couple moved to Bastrop in May 1973. In the fall of 1974 plaintiff and defendant moved to New Orleans so that plaintiff could attend dental school. Their son Zach was born in New Orleans in February, 1975. Except for one semester *651 surrounding the time Zach was born defendant taught school while they were in New Orleans. As graduation from dental school approached the couple considered a number of possibilities of where they would locate. Although defendant was apprehensive about moving to the small town of Bastrop in close proximity to plaintiff's parents, a mutual decision was made to move back to Bastrop so that plaintiff could go into his father's dental practice. They moved back in June 1978 and lived in a house next door to the dental office and within a few doors of plaintiff's parents, where they continued to live until their separation in September 1980.
While plaintiff and defendant were living in New Orleans plaintiff began participating in a psychotherapy group organized by a friend and defendant also participated in some therapy sessions at that time. In January 1978 while still in New Orleans defendant began counseling and therapy with a transactional analysis therapist and continued to see the therapist for one hour a week until June when they moved back to Bastrop.
After moving back to Bastrop defendant resumed her therapy sessions, traveling to New Orleans once in September, once in October, and periodically in November and December of 1978. Defendant stopped going to New Orleans for therapy between December 1978 and October 1979 when she again began participating in her therapy group on a regular basis until the parties separated. She attended therapy sessions in New Orleans, usually on the weekends, at least once a month and on three occasions attended week-long therapy sessions in Mississippi and Florida.
Plaintiff thoroughly disapproved of his wife's participation in the therapy sessions with what he regarded as incompetent therapists and which required her being away from home frequently. His suggestion that defendant obtain therapy closer to home was rejected by defendant. The marital relationship between plaintiff and defendant rapidly deteriorated. Obviously anticipating the breakup of their marriage, plaintiff talked to a lawyer, employed private investigators to investigate defendant's activities in connection with the group therapy sessions, and began to make photocopies of defendant's private diary she kept in connection with her therapy and of a letter defendant wrote to a male member of the therapy group. The diary and the letter caused plaintiff concern because of their sexual overtones and the indication of a sexual involvement by defendant with the man to whom she wrote.
In August 1980 defendant, over plaintiff's protest, went to a therapy session in Florida with a Shreveport doctor, plaintiff's cousin, and his wife. When the bus on which defendant was returning home a week or so later stopped at the bus station in Monroe, defendant was served by a deputy sheriff with the petition for separation and custody filed by plaintiff in this case. Plaintiff was at the bus station, put defendant's luggage in the family Volkswagen, gave defendant $100, and told her she was no longer welcome at home and could not return there. Defendant went to the home of the Shreveport doctor and his wife, where she stayed through the trial of this matter which extended over a period of several months.
The Separation Judgment
The trial court found that the action of plaintiff in forcing defendant to leave the matrimonial domicile amounted to "forced" or constructive abandonment. The court further found, however, that defendant "was not free from fault in her mannerisms and in her activity with the therapy of which her husband disapproved." The court held that the parties were entitled to a separation on the basis of their mutual fault which caused the dissolution of the marital relationship.
Both parties urge on appeal that the findings of the trial court are legally inconsistent. If defendant was guilty of fault giving plaintiff lawful cause to ban her from the marital home, then plaintiff's actions could not amount to constructive abandonment. On the other hand, if defendant's conduct did not amount to cruel treatment *652 giving plaintiff grounds for a separation on that basis, then plaintiff's actions did amount to constructive abandonment and defendant is entitled to the separation.
A separation may be granted although both spouses are mutually at fault in causing the separation. LSA-C.C. Art. 141. Mutual fault is conduct which would provide each of the parties with an independent ground for separation under LSA-C.C. Art. 138. Adams v. Adams, 389 So.2d 381 (La.1980); Ebey v. Ebey, 403 So.2d 790 (La. App.2d Cir. 1981); Miller v. Miller, 398 So.2d 1162 (La.App.2d Cir. 1981).
A separation may be granted on grounds of abandonment if it is established that one of the parties withdrew from the marital domicile without lawful cause and constantly refused to return. LSA-C.C. Art. 143; Von Bechman v. Von Bechman, 386 So.2d 910 (La.1980). Similarly, barring a spouse from the matrimonial domicile without lawful cause constitutes constructive abandonment. Kriger v. Kriger, 397 So.2d 21 (La.App.2d Cir. 1981); Gipson v. Gipson, 379 So.2d 1171 (La.App.2d Cir. 1980), writ denied 383 So.2d 799 (La.1980); Burnett v. Burnett, 349 So.2d 488 (La. App.3d Cir. 1977). Lawful cause justifying withdrawal from or barring the other spouse from the common dwelling is substantially equivalent to a cause giving the withdrawing spouse grounds for a separation under LSA-C.C. Art. 138. Mere friction, dissatisfaction or incompatibility, however intense, are not enough to constitute lawful cause. See: Lewis v. Lewis, 345 So.2d 1010 (La.App.2d Cir. 1977); Hatch v. Hatch, 335 So.2d 707 (La.App.2d Cir. 1976), writ denied 338 So.2d 113 (La.1976); Burnett v. Burnett, 324 So.2d 622 (La.App.2d Cir. 1975); Barron v. Barron, 279 So.2d 208 (La.App.2d Cir. 1973). But compare: Mahmud v. Mahmud, 384 So.2d 823 (La.App. 4th Cir. 1980); Anderson v. Anderson, 379 So.2d 795 (La.App. 4th Cir. 1980); Levine v. Levine, 373 So.2d 1380 (La.App. 4th Cir. 1979); Bergeron v. Bergeron, 372 So.2d 731 (La. App. 4th Cir. 1979); Sykes v. Sykes, 321 So.2d 805 (La.App. 4th Cir. 1975).
Plaintiff argues that he is entitled to a separation on the grounds of cruel treatment because of defendant's absence from home on numerous occasions to attend the therapy sessions, because of the defendant's changes in behavior in a number of respects such as withdrawing from social relationships with their friends, withdrawing from a normal marital sexual relationship, keeping dolls and toys for herself around the house, allowing the house to be messy and failing to provide adequate meals for plaintiff and the child, and in having a sexual affair with the man to whom she wrote the letter and perhaps with other men in the therapy group.
Defendant argues that she is entitled to a separation on the grounds of abandonment because she gave plaintiff no lawful cause for ejecting her from the home. Defendant contends she participated in the therapy sessions because of her depression and apprehension and was making an effort to improve and cope with her life situation and with her husband's seemingly hostile attitude toward her and their child. Defendant denies that her behavior was in any way bizarre or that she was not a good housekeeper or in any way neglected her husband or the child. Defendant emphatically denies any sexual involvement with the man to whom she wrote the letter or any sexual overtones in the therapy sessions.
There was evidence and testimony supporting plaintiff's contentions and there was also evidence and testimony supporting the defendant's position.
The evidence is not at all convincing that defendant neglected her home, her husband, or her child to any significant degree. While plaintiff understandably objected to defendant's absences from home, the absences were for what she perceived to be good reasons, in the best interest of her and her family, and were not that extensive. The dolls or toys were part of the regression or reparenting aspects of the transactional analysis therapy. Defendant's suggestion that there would be times when she did not want to have sex during a certain *653 phase of her therapy was not a permanent or extended rejection of normal marital sexual activity. In fact, at the time this matter came up, plaintiff had become dissatisfied with sleeping with the defendant and it was plaintiff who decided to start sleeping in another room.
The diary and letter which plaintiff discovered and copied do contain language that is suggestive of sexual overtones in the therapy sessions and sexual involvement with the man to whom the letter was written. Plaintiff's concern after reading these items is understandable. Plaintiff was also probably getting disturbing feedback from two friends in whose wives defendant had confided.
The evidence is convincing, however, that there were, in fact, no sexual overtones to the therapy sessions and no sexual involvement by defendant with the other man. Many of the terms used in transactional analysis could have sexual connotations stroking, touching, sexualizing, fantasizing. The therapy involves regression to childhood stages and reparenting, as well as the experiencing and expressing of emotions and fantasy thoughts connected therewith. The writings giving rise to the allegations of sexual misconduct were satisfactorily explained and no sexual misconduct on the part of defendant was established.
The conduct and activities of the defendant, although disapproved of by the plaintiff with some reason from his point of view, did not rise to the level of or amount to cruel treatment such as would render the continuation of their life together insupportable. Since defendant's conduct was not substantially equivalent to that which would give plaintiff legal grounds for a separation, he was not justified in forcing her to leave the family home and his action in doing so amounted to constructive abandonment.
Accordingly, the judgment awarding a separation on the grounds of mutual fault will be set aside and judgment will be rendered granting defendant a separation from the plaintiff on the grounds of abandonment.
The Custody Judgment
On the issue of custody the trial court made the following findings of fact:
"The Court will now address itself to the issue of custody of the minor child, Zach. Throughout the lengthy trial of approximately 16 to 17 trial days, attempts were made by both counsel to put on trial `the therapy' Mrs. Quinn was undergoing. Much to do was made about the type of therapy, what it involved, who it involved, how beneficial it was, the training which the persons had in administering the therapy and the Court, frankly, does not feel that it must rule on `the therapy' or put `the therapy' on trial. The Court had before it two parents who obviously love dearly their son, Zach. Both parents actively desire the custody of this child and the Court spent the better part of its 16- to 17-odd trial days examining and viewing and evaluating independently the two persons seeking custody.
"The Court finds that Mrs. Quinn is a well-educated, attractive, well-mannered individual who is certainly capable of raising her son, loving her son and providing her son with the necessities of life. On the other hand the Court finds that Dr. Quinn is a healthy, well-mannered, qualified dentist enjoying a successful practice in Morehouse Parish. There does not exist any question in the Court's mind that both of these parties would be able to financially support and care for the minor child involved in this litigation. Much was made to do about trying to evaluate and analyze Mrs. Quinn as to different tests and scores she had as a result of an evaluation by Dr. Goebel. The Court felt that it understood Dr. Goebel's evaluation and analysis of Mrs. Quinn and the Court also understands that Dr. Thrasher disagrees somewhat with not the evaluation of Mrs. Quinn but the actual computation and analysis of the test scores. However, again the Court observed these persons in various situations, some stressful, some happy and feels that it made an accurate evaluation of the individuals who seek the custody of this minor child.
*654 "There was evidence introduced that Judy Quinn was a poor housekeeper and poor cook and there was evidence introduced that Judy Quinn was a good housekeeper and a good cook. As stated earlier, the Court feels that Judy Quinn, if given custody, would provide adequate meals, clothing, shelter and a basic environment that would not be physically detrimental to her son. There was testimony that if Dr. Quinn receives custody that the child would basically be raised by his grandparents in lieu of Dr. Quinn. However, the Court feels this would not be the case. The Court will note that it did not talk with the minor or allow any expressions of the minor's preference to be offered in open court; however, this was done through an offer of proof which an appellate court may or may not choose to review.
"Mrs. Quinn, when questioned about where she intends to reside, indicated that it would probably be Shreveport, Lafayette or New Orleans. Dr. Quinn, when questioned about where he would live, indicated Morehouse Parish. The Court must look to the traumatic events which have taken place in this young child's life and must attempt at this point to give some stability to this young child's life in order that it will not be considered `a product of a broken home' which the Court finds so often in dealing with the juvenile court. After reviewing the entire facts, considering the entire evidence, the persons who spoke in behalf of Mrs. Quinn, persons who spoke in behalf of Dr. Quinn, and analysis of the situation by this Court, this trier of fact feels that the minor child, Zachary Quinn, needs would best be suited by being raised by his father in Morehouse Parish where there are definite roots and family ties. The Court feels this child desperately needs a stable, familiar environment at this stage of his life. The Court will allow liberal visitations to the mother...."
On appeal the defendant emphasizes the recognized fact that in many, if not most, cases it is in the best interest of a child of tender years to be in the custody of the child's mother where the mother has been the primary nurturing parent and a close bond exists between the child and the mother. Thornton v. Thornton, 377 So.2d 417 (La.App.2d Cir. 1979); Nale v. Nale, 409 So.2d 1299 (La.App.2d Cir. 1982). The plaintiff emphasizes the recognized fact that it is often in the best interest of the child to remain in a secure environment to which the child is accustomed. Hegan v. Hegan, 367 So.2d 147 (La.App.2d Cir. 1979). Plaintiff also emphasizes the important rule that in a custody case the trial court's decision is entitled to great weight and should not be set aside in the absence of a clear abuse of discretion. See: Cleeton v. Cleeton, 383 So.2d 1231 (La.1980); Jowers v. Jowers, 393 So.2d 790 (La.App.2d Cir. 1981).
The sole consideration in determining custody is the best interest of the child. LSA-C.C. Art. 157.
In this case the trial court's findings of fact in regard to the fitness and ability of both parents to adequately care for the child are amply supported by the evidence. The trial court's decision that it is in the best interest of the child for the father to have custody is supported by the evidence and sound reasons.
Some of the best interest factors tending to favor custody in the mother and weighing against the father's custody are:
(1) The defendant mother has been the primary nurturing parent of the five-year-old child since the child's birth and a close bond exists between the mother and the child. Even according to plaintiff and his relatives the bond is unusually close, even to a fault according to plaintiff's witnesses;
(2) Defendant's present insecure situation and unknown future were created by plaintiff's election to bar her from their home and to terminate the marital relationship without lawful cause; and
(3) A certain degree of lack of compassion and understanding is demonstrated by plaintiff in his attitude toward defendant and her therapy and his decision to terminate the marriage.
Some of the best interest factors favoring the father's custody and weighing against custody in the mother are:

*655 (1) Plaintiff has been and is a loving, attentive father, more so than in the usual family situation, and has provided nurturing care for the child;
(2) If the father is given custody the child will continue to reside in the home in surroundings where he was living at the time of the separation and to which he is accustomed. The child will not be moved to another locale;
(3) The child's paternal grandparents live nearby and are available to assist in providing love, care and attention to the child;
(4) The father's work situation is such that he can get away during the noon hour, in the early afternoon, and at other times in order to provide attention to the child and the child's needs, more than is the usual situation for the working father;
(5) Some degree of instability on the part of defendant at this stage in her life is evidenced by her failure to cope with and adjust to life in Bastrop and her feeling of need for psychotherapy;
(6) There is a lack of plans or direction by the mother as to where she will live and under what circumstances she would care for her son. This lack of plans was partially explained by the fact that defendant was uncertain as to custody, alimony and child support, but at the conclusion of several months of litigation the mother still had no definite plans in the event she was awarded custody;
(7) With the father the child would be in a religious, churchgoing environment. Defendant did not attend church with the father and child while they lived together; and
(8) The environment in which the child would live with his father is certain, safe, and secure whereas the environment in which the child would live with his mother is somewhat speculative.
On balance, the trial court's discretion was soundly exercised in awarding custody of the five-year-old son to the plaintiff father in this case.
The Alimony Judgment
In reasons for judgment handed down April 20, 1981, the trial court "found that Mrs. Quinn was unemployed, although a trained and qualified and employable person" and made "an award of alimony pendente lite in the amount of $1,000 per month effective April 1, 1981". The reasons for judgment contain no findings of fact in regard to the amount of alimony and articulate no reasons why the award was not made effective as of judicial demand in September 1980. Defendant argues on appeal that the amount awarded is insufficient and that the award should have been made effective as of the date of judicial demand.
Defendant prayed for alimony and child support in the amount of $1,500. Defendant testified at trial as to her anticipated expenses if she were to rent an apartment and the like, but her actual expenses through the time of trial were less because she was living with her friends in Shreveport. Plaintiff is well able to pay the amount of the award or more. All factors considered, the amount of the award is on the low side but does not amount to abuse of the trial court's discretion as to amount.
The alimony issue was tried along with the custody and separation issues, resulting in a delay of several months from the time of judicial demand until decision. Generally, alimony pendente lite is set from date of judicial demand. Nolte v. Nolte, 258 So.2d 118 (La.App.2d Cir. 1972), writ denied 261 La. 538, 260 So.2d 321 (1972). However, the court does have discretion to fix the effective date of alimony pendente lite at a later date provided the action is fair and reasonable under the circumstances presented and if reasons are presented leading to a conclusion that it would be impractical and inequitable to commence accrual of alimony at the retroactive date of judicial demand. Cumpton v. Cumpton, 283 So.2d 846 (La.App.2d Cir. 1973).
In this case it was established that defendant was without income, except for some amounts given to her by plaintiff, *656 from the time of the separation through the trial of the matter. No reasons were presented why the alimony award should not have been effective from judicial demand and it was not demonstrated that there would be any unfairness or hardship on the plaintiff in making the award retroactive to judicial demand. The record does not reveal any sound reason for commencing alimony at a later date. Accordingly, we will amend the judgment to make the award of alimony pendente lite effective October 1, 1980.
Decree
For the reasons assigned the judgment awarding a separation on the grounds of mutual fault is set aside and judgment is hereby rendered in favor of defendant, Judith Lynn Fletcher Quinn, and against plaintiff, Donald Mouton Quinn, awarding a separation between the parties on the grounds of plaintiff's constructive abandonment of the defendant. The judgment is further amended to make the effective date of the award of alimony pendente lite October 1, 1980 rather than April 1, 1981, subject to a credit for any amounts paid by plaintiff to defendant after October 1, 1980. The judgment of the district court is otherwise affirmed. Costs of the appeal are assessed to the community.
NOTES
[*] SEXTON, J., dissents from refusal to grant rehearing on behalf of Plaintiff-Appellee.

FRED W. JONES, Jr., J., dissents from refusal to grant rehearing on behalf of Plaintiff-Appellee and on behalf of Defendant-Appellant.